OPINION
{¶ 1} Defendant-appellant Daniel C. Azbell appeals his January 15, 2004 conviction and sentence on one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE {¶ 2} On August 8, 2003, the Fairfield County Grand Jury indicted appellant on one count of gross sexual imposition involving a five year old child, in violation of O.R.C. 2907.05(A)(4).
 {¶ 3} Prior to trial, the trial court conducted a voir dire of the child victim witness to determine whether the child was competent to testify at trial. Despite appellant's objection, all of the questions posed were asked by the court, not the parties. Following the court's excusing the child, appellant's counsel proffered questions she would have asked the child. The trial court found the child competent to testify at trial.
 {¶ 4} The matter proceeded to jury trial on January 13th, 2004, and resulted in a verdict of guilty on January 15, 2004.
 {¶ 5} Appellant filed a motion for judgment of acquittal and/or a motion for new trial on January 29, 2004. The trial court overruled the motion via Judgment Entry filed February 4, 2004.
 {¶ 6} On February 9, 2004, appellant was sentenced to three years in prison.
 {¶ 7} Appellant now appeals, raising the following as assignments of error:
 {¶ 8} "I. The trial court erred, to the prejudice of defendant-appellant, in determining that the child witness was competent to testify.
 {¶ 9} "II. The trial court erred, to the prejudice of defendant-appellant, in admitting testimony and portions of the medical records concerning opinion of the child witness' competency and truthfulness.
 {¶ 10} "III. The trial court erred in admitting out-of-court statements made by the alleged victim in violation of U.S. Const. Amend. VI.
 {¶ 11} "IV. The trial court erred in permitting the testimony of oshp trooper hodson in violation of Ohio Evid. R. 403(a).
 {¶ 12} "V. The trial court erred in failing to permit the proffered testimony of defendant-appellant's wife and sister regarding prior instances of sexual conduct of the child witness.
 {¶ 13} "VI. The trial court erred in denying defendant-appellant's motion for acquittal and/or new trial.
 {¶ 14} "VII. The verdict was against the manifest weight of the evidence."
 I {¶ 15} In his first assignment of error, appellant maintains the trial court erred in determining the child witness was competent to testify. Specifically, appellant argues the trial court's voir dire of the child was improper, and the trial court improperly refused to allow appellant's counsel to question the witness.
 {¶ 16} We review a trial court's determination of a witness' competency under an abuse of discretion standard. To demonstrate an abuse of discretion, appellant must show more than error of law or judgment, he must show the trial court's attitude was unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157,404 N.E.2d 144.
 {¶ 17} The competency of a witness to testify at trial is governed by Evid. R. 601, which provides, "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 18} In State v. Frazier (1991), 61 Ohio St.3d 274, 574 N.E.2d 483, the Ohio Supreme Court set forth certain factors a trial court must consider when making a determination of whether a child under ten years of age is competent to testify. Specifically, Frazier states:
 {¶ 19} "In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." Id. at syllabus.
 {¶ 20} The Ohio Supreme Court again addressed the issue in State v.Said (1994), 71 Ohio St.3d 473:
 {¶ 21} "A competency hearing is an indispensable tool in this and similar cases. A court cannot determine the competency of a child through consideration of the child's outof-court statements standing alone. As we explained in State v. Wilson (1952), 156 Ohio St. 525, 46 O.O. 437,103 N.E.2d 552, the essential questions of competency can be answered only through an in-person hearing: "The child's appearance, fear or composure, general demeanor and manner of answering, and any indication of coaching or instruction as to answers to be given are as significant as the words used in answering during the examination, to determine competency."
 {¶ 22} In the matter sub judice, the trial court conducted a vior dire examination of the child witness in chambers:
 {¶ 23} "THE COURT: We're on the record in chambers. Today is 1/13, 2004. It's approximately 2:15, 2:20 p.m. This is Case 03-CR-232, State ofOhio versus Daniel C. Azbell.
 {¶ 24} "Denise MacFadden, Prosecuting Attorney, is in chambers. Margaret Smith and Raina Cornell, Defense counsel, are present. Daniel Azbell is present. Jennifer Boggs, Victim's Advocate, and Diamond Summerfield is also present. Are you Diamond?
 {¶ 25} "(No verbal response.)
 {¶ 26} "THE COURT: My name is Chris Martin. Mr. Martin, can you say that?
 {¶ 27} "DIAMOND SUMMERFIELD: Say what?
 {¶ 28} "THE COURT: Mr. Martin?
 {¶ 29} "DIAMOND SUMMERFIELD: Mr. Martin.
 {¶ 30} "THE COURT: Okay. Sounds like you've got a small voice. Can you speak — can you talk louder?
 {¶ 31} "(No verbal response.)
 {¶ 32} "THE COURT: Can you? When you go to school, do you ever go out on the playground?
 {¶ 33} "DIAMOND SUMMERFIELD: Huh?
 {¶ 34} "THE COURT: When you go to school, do you — do you go to school?
 {¶ 35} "(No verbal response.)
 {¶ 36} "THE COURT: Yes? Okay. Where do you go to school at?
 {¶ 37} "DIAMOND SUMMERFIELD: North School.
 {¶ 38} "THE COURT: Okay. And what grade are you in?
 {¶ 39} "DIAMOND SUMMERFIELD: First.
 {¶ 40} "THE COURT: When you go out on the playground, do you talk real loud?
 {¶ 41} "Sometimes?
 {¶ 42} "DIAMOND SUMMERFIELD: I never keep track of my words. I just speak.
 {¶ 43} "THE COURT: You just speak? Okay. How old are you?
 {¶ 44} "DIAMOND SUMMERFIELD: Six.
 {¶ 45} "THE COURT: When's your birthday, do you know?
 {¶ 46} "DIAMOND SUMMERFIELD: April the 15th.
 {¶ 47} "THE COURT: Will you be seven this April?
 {¶ 48} "(No verbal response.)
 {¶ 49} "THE COURT: Diamond, do you know the difference between telling the truth and telling a lie?
 {¶ 50} "(No verbal response.)
 {¶ 51} "THE COURT: You're shaking your head yes. Can you tell me what that is? And speak loudly so I know, so I can hear you.
 {¶ 52} "DIAMOND SUMMERFIELD: The truth is when you tell the right thing and a lie is when you don't.
 {¶ 53} "THE COURT: Okay. The truth is when you tell the right thing and a lie is when you don't? Is that what you said?
 {¶ 54} "(No verbal response.)
 {¶ 55} "THE COURT: Okay. Can you give me an example of something that's telling the truth? In other words, if I said this — see this folder here? Do you know what your colors are?
 {¶ 56} "(No verbal response.)
 {¶ 57} "THE COURT: Okay. What color is this?
 {¶ 58} "DIAMOND SUMMERFIELD: Red.
 {¶ 59} "THE COURT: Okay. If I said that this folder is red, would that be telling the truth —
 {¶ 60} "DIAMOND SUMMERFIELD: Truth.
 {¶ 61} "THE COURT: — or telling a lie?
 {¶ 62} "DIAMOND SUMMERFIELD: Truth.
 {¶ 63} "THE COURT: Truth? If I said this folder is blue, would I be telling —
 {¶ 64} "DIAMOND SUMMERFIELD: Lie.
 {¶ 65} "THE COURT: Lie? Okay. And what kinds of things can happen if you don't tell the truth?
 {¶ 66} "DIAMOND SUMMERFIELD: You'll get grounded.
 {¶ 67} "THE COURT: Get grounded?
 {¶ 68} "DIAMOND SUMMERFIELD: Or have to stand up in a corner.
 {¶ 69} "THE COURT: Have you stand where?
 {¶ 70} "DIAMOND SUMMERFIELD: In the corner.
 {¶ 71} "THE COURT: Stand in the corner? Okay. Have you been — had to stand in the corner for not being truthful?
 {¶ 72} "DIAMOND SUMMERFIELD: Not for that.
 {¶ 73} "THE COURT: Do you tell the truth?
 {¶ 74} "(No verbal response.)
 {¶ 75} "THE COURT: You're shaking your head yes.
 {¶ 76} "DIAMOND SUMMERFIELD: Yes.
 {¶ 77} "THE COURT: Okay. If we go into the courtroom, if-you can remember things, will you tell the truth?
 {¶ 78} "DIAMOND SUMMERFIELD: Yes.
 {¶ 79} "THE COURT: Okay. What do you have there? Do you have a ball?
 {¶ 80} "(No verbal response.)
 {¶ 81} "THE COURT: What kind of ball is that?
 {¶ 82} "(No verbal response.)
 {¶ 83} "THE COURT: Don't know?
 {¶ 84} "(No verbal response.)
 {¶ 85} "THE COURT: Okay. What color is the ball?
 {¶ 86} "DIAMOND SUMMERFIELD: Pinkish.
 {¶ 87} "THE COURT: Pinkish? So if you told me that the ball was pinkish, would that be the truth or a lie?
 {¶ 88} "DIAMOND SUMMERFIELD: Truth.
 {¶ 89} "THE COURT:, So if we go in the courtroom, will you tell the truth?
 {¶ 90} "DIAMOND SUMMERFIELD: Yes.
 {¶ 91} "THE COURT: Okay. Will you be afraid if people ask you questions?
 {¶ 92} "DIAMOND SUMMERFIELD: I don't know.
 {¶ 93} "THE COURT: Will you be brave?
 {¶ 94} "DIAMOND SUMMERFIELD: Yeah.
 {¶ 95} "THE COURT: Okay. That's all we want you to do is tell the truth. Do you understand?
 {¶ 96} "DIAMOND SUMMERFIELD: Yeah.
 {¶ 97} "THE COURT: Okay. When we go in the courtroom, you'll have to talk real loud so people can hear. Is there anything — I guess we'll conclude this at this point. We'll stay on the record. Ms. Smith wanted to make a statement on the record.
 {¶ 98} "Thank you very much.
 {¶ 99} * * *
 {¶ 100} "Ms. Smith, you had indicated before we went on the record that in your motion to exclude the testimony of Diamond Summerfield, you had asked that she be voir dired and also that you be permitted to ask questions.
 {¶ 101} "MS. SMITH: Yes.
 {¶ 102} "THE COURT: Okay. And do you have, off hand, do you have any authority for that, any legal authority?
 {¶ 103} "MS. SMITH: I don't offhand. As I said off the record earlier, I think the rule is pretty unclear in determining what happens inside of chambers. And the case law that I have cited does speak with regard to the Court voir diring the child. Off the top of my head, no, I don't have anything in terms of authority. I just believe that I have some followup questions that are appropriate with regard to her veracity.
 {¶ 104} "THE COURT: Do you want to state for the record what those questions are?
 {¶ 105} "MS. SMITH: I would like to follow up with some questions. She stated to the Court that telling the truth is knowing what is the right thing. And I'm curious to know how she determines what is the right thing, if she's been taught what's the right thing, those types of issues.
 {¶ 106} "She talked about what would happen if she would lie. She talked about standing in the corner, being grounded. I think her testimony today is a little more serious than maybe what she portrays as the gravity of the situation; that we're in an adult court and if you lie, there's pretty heavy consequences to lying. And I'm not so sure that she comprehends the gravity of the situation.
 {¶ 107} "THE COURT: Okay. Thank you. And I'll take that as a proffer of proposed questions.
 {¶ 108} "Ms. MacFadden, any response?
 {¶ 109} "MS. MacFADDEN: I think the case law pretty much indicates that it's within the sound discretion of the Court as to whether the Court does the questioning in voir dire alone or allows counsel to also question, et cetera.
 {¶ 110} "In terms of the particular questions that Ms. Smith desires to ask, I think it would be very confusing, because defining truth and lie is difficult even for an adult. And her statement that telling the truth is to say the right thing and telling a lie is to say the wrong thing hopefully, would indicate a moral value on her part that telling the truth is right. As far as how she knows what's right, Ms. Smith indicated that she wanted to know who — whether she was taught what's right. Well, I hope she was taught what's right. I hope I'm teaching my children what's right and what I feel is wrong. So I, think even if the child were to say, "My mom taught me what was right," it would not indicate that the child was lying about the matter in question.
 {¶ 111} "I think as long as the Court makes its determination that the questions indicate to the Court, to the Court's satisfaction, that all the questions in State versus Frazier, one through five, are answered, then that's within the Court's discretion.
 {¶ 112} "Of course, if the Court would allow counsel to ask questions, I, of course, would have my own questions. I think if the Court feels that it does not want to allow counsel — if there are questions that counsel feel need asked, then I think we could submit them to you and you could ask those.
 {¶ 113} "THE COURT: What I'm going to do — I decide that based on the responses to the questions that were given by Diamond Summerfield, the Court is satisfied that the — in making a threshold determination that she is qualified to testify as a witness in the case.
 {¶ 114} "Certainly, if there are other questions concerning testing her understanding of telling-of being truthful, I think that counsel would have the opportunity during examination of the witness to test the veracity of the witness, just like counsel would in any other situation. The threshold determination is really to — is for the Court to make a decision whether or not to even allow the witness to testify.
 {¶ 115} "And the Court's satisfied in this case that Diamond Summerfield — she seems to be intelligent for her age. She understands — she understood the Court's questions. She didn't ask me to repeat questions. She didn't seem to not understand what I was asking. And I specifically find that her stating — when I asked her the difference between telling the truth and telling a lie, her stating that telling the truth is the right thing and telling a lie is the wrong thing. She was sincere in that response to the Court's question and seemed to have, by her expression, the way she expressed that statement, seemed to very much have an understanding of what it means to tell — the difference between telling the truth and telling a lie.
 {¶ 116} "And then the Court asked her to come up with some examples. She gave examples and the Court asked her for responses to a couple of examples, and she responded correctly to all of the examples. So I find that she meets the threshold requirement to testify." Tr. at 35-45.
 {¶ 117} In State v. Larie, December 16, 1996, Licking App. No. 96CA51, this Court held:
 {¶ 118} "The trial court is the best person to judge the issue of competency. Although examination by trial counsel may very well aid in the decision, it is not necessary, nor crucial, to the trial court's determination."
 {¶ 119} Upon review of the above, the trial court did not abuse its discretion in excluding questioning by counsel during the voir dire of the child witness. The trial court further did not abuse its discretion in determining the child witness was competent to testify at trial pursuant to the guidance of State v. Frazier, supra, and State v. Said,
supra.
 {¶ 120} Appellant's first assignment of error is overruled.
 II {¶ 121} In the second assignment of error, appellant argues the trial court erred in admitting testimony and portions of medical records concerning opinions of the child witness' competency and truthfulness. Specifically, appellant asserts the testimony of the licensed, independent social worker, Lynn Finnefrock, contained specific statements the child was able to tell the difference between a truth and a lie.
 {¶ 122} Initially, we note the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173. Therefore, we will not disturb a trial court's evidentiary ruling unless we find a ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151,404 N.E.2d 144.
 {¶ 123} The trial court addressed appellant's motion to exclude testimony and portions of medical records regarding truth and veracity of the alleged victim prior to trial. The following exchange took place:
 {¶ 124} "MS. SMITH: Within the medical records, it appears that her medical providers were making statements pertaining to whether or not they believed she was telling the truth and what her perceptions were. And I argue that these are not appropriate opinions to be made and that they should be redacted from the records before the jury would see them and that they should not be discussed through testimony.
 {¶ 125} "THE COURT: Ms. MacFadden?
 {¶ 126} "MS. MacFADDEN: I don't really recall anything in the medical record which indicates — I know there is part of the record where the personnel indicate that they believe she knows the difference between the truth or lie. But I don't know — but yes, if there is a statement in there that says the social worker or doctor says this child's truthful, then I agree, I don't think that opinion may be admitted.
 {¶ 127} "MS. SMITH: There's a paragraph from the second page. It's essentially a voir dire, in my opinion, of her. I was able to catch this interviewer in lies and correct the statement it demonstrates the ability to distinguish truth.
 {¶ 128} "MS. MacFADDEN: But I don't think that indicates that what she's saying is truthful. I think the caseworker or doctor is able to say, "I questioned her on whether this was a lie or this was the truth, and she knew it." I don't think that comments on her credibility.
 {¶ 129} "THE COURT: I'm going to overrule the motion. I believe that as Ms. MacFadden indicated, if there are any healthcare providers who D.T.S. made statements to, if it comes up as to what the statements were made and that there's some difference between statements, then certainly, the Defense can cross-examine that witness to the extent that the Defense wishes to concerning those matters or even any opinion that that healthcare provider may arrive at, because there's a lot more to making that type" of conclusion than just the sheer statements. It could be body language it could be a lot of factors.
 {¶ 130} "So we'll give the witnesses at least an opportunity to explain why they came to their conclusion. And certainly, the Defense has an opportunity to cross-examine." Tr. at 11-13.
 {¶ 131} Further, the trial court's January 22, 2004 Judgment Entry holds:
 {¶ 132} "With regard to the Defendant's Motion to Exclude Testimony and Portions of Medical Records Regarding Truth and Veracity of Alleged Victim D.T.S., the Court overruled said motion in part and ordered that statements in the medical record regarding the patient's ability to distinguish between truth and falsehood were admissible. The Court sustained in part and ordered that any statement in the medical record which gives an opinion on the veracity of the patient shall be excluded."
 {¶ 133} At trial, Ms. Finnefrock testified:
 {¶ 134} "Q. Okay. All right. what types of questions do you ask — let me back up. Do you start out with this type of question or do you start out with other questions, like the truth and lie, or some rapport building previous to those?
 {¶ 135} "A. We do rapport building. I need to also figure out if this is a child who's going to be interviewable. Some kids can't give me enough information that I can even ask their name or their age. And she did great. We went through counting. We went through colors. We did prepositions, because I need to know that when I ask her, "Did the hand go under the clothes or over," that she knows what we're talking about. So I had her place a crayon on top of something, under something, inside of something, and she was able to do all that. We also needed to figure out if she did know what truth versus lie was. And she said it's better to tell the truth —
 {¶ 136} "MS. SMITH: I'm going to object.
 {¶ 137} "THE COURT: Basis?
 {¶ 138} "MS. SMITH: This witness isn't qualified to testify as to the veracity of this child.
 {¶ 139} "THE COURT: Ms. MacFadden?
 {¶ 140} "MS. MacFADDEN: As discussed previous, Your Honor, I don't believe that is what Ms. Finnefrock is doing. She's indicating that she has questioned the child concerning the child's ability to understand the difference between telling the truth and telling a lie, and that is Ms. Finnefrock's purpose for the questioning. And she is not indicating whether the child was truthful or not, but that she did understand the difference.
 {¶ 141} "THE COURT: Overruled.
 {¶ 142} "Q. (By Ms. MacFadden) All right. What type of questions did you ask Diamond about telling the truth, telling a lie?
 {¶ 143} "A. With kids, I like to have them catch me in several lies, just so I can actually — they can tell me they know the difference between truth versus lie. And I'll usually say, "There are two girls in the room; is that true?" And they'll say yes. "Is there an elephant in the corner?" And they usually giggle and say no. And then I always ask them, "If I say anything incorrectly or if I don't understand you, feel free to correct me." And I'll usually go, "Your name is Susie," and they will correct me right away, which I know they're comfortable with if I don't get something right in the interview process also.
 {¶ 144} "Q Okay. And in this particular case, did you feel that Diamond did know the difference between truth and lie?
 {¶ 145} "A. Yes." Tr. at 215-217.
 {¶ 146} The Ohio Supreme Court has set forth a witness may not testify as to the veracity of the statements of a child witness. State v. Boston
(1989), 46 Ohio St.3d 108. However, consistent with our prior opinions inState v. Moore, January 13, 2003, 2002-Ohio-4066 and State v. Dixon,
2004-Ohio-3940, the social worker's testimony was not equivalent to testifying regarding the child's veracity, but rather equivalent to a determination whether the child was able to distinguish between a truth and a lie.
 {¶ 147} Ms. Finnefrock did not testify the child was telling the truth regarding her allegations of child abuse; rather, she testified the child was capable of distinguishing between a truth and a lie, which is permissible under Boston.
 {¶ 148} Accordingly, the trial court did not abuse its discretion by admitting the testimony of the social worker, and appellant's second assignment of error is overruled.
 III {¶ 149} In his third assignment of error, appellant contends the trial court erred in admitting out of court statements made by the alleged child victim. Specifically, appellant maintains the records and testimony of Ms. Finnefrock concerning the alleged victim's out of court statements were inadmissible hearsay.
 {¶ 150} At trial, the trial court allowed the social worker to testify concerning notations in the Children's Hospital medical records concerning the child's statements appellant touched her in her "private spot."
 {¶ 151} Again, a trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice." Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271,569 N.E.2d 1056. The words "abuse of discretion" mean that the trial court acted unreasonably, arbitrarily or unconscionably. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. An error in an evidentiary ruling does not warrant reversal of the trial court's judgment unless the trial court's actions were inconsistent with substantial justice and affected the substantial rights of the parties. Evid.R. 103 and Civ.R. 61.
 {¶ 152} We agree the social worker's testimony is hearsay pursuant to Evid.R. 801. As such, her testimony recounting the victims' statements is inadmissible except as provided by rule, statute or constitutional provision. Evid.R. 802. Evid.R. 803(4) provides an exception to the hearsay rule: "Statements for purposes of medical diagnosis or treatment and describing medical history or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 153} The following exchange took place at trial:
 {¶ 154} "Q. Okay. And is it important to know how to interview children?
 {¶ 155} "A. It's very important.
 {¶ 156} "Q. And why is that?
 {¶ 157} "A. It takes a special technique to work with children, to make sure it's leading — or not leading, and to also make sure it's a fair interview.
 {¶ 158} "Q. Okay. And what are the types of things that you have to be aware of in this type of interview?
 {¶ 159} "A. You have to be aware of a child's developmental level. You also have to be very
 {¶ 160} careful with children that you don't lead them into anythinq, that you get the correct answers, so that way I can talk to the doctors
and we know how to treat them medically.
 {¶ 161} "Q. Okay. And what is the — does Children's Hospital work on a team approach?
 {¶ 162} "A. We have a team approach. I coordinate with the nurses andalso the doctors.
 {¶ 163} "Q. Okay. And when the child comes into Children's Hospital, what is the procedure?
 {¶ 164} "A. The procedure is, we usually talk to a parent to find out the chief complaint and then I'm going to speak to the child first so Ican know how to treat them medically, and then I give that information tothe doctor, and then there's an exam.
 {¶ 165} * * *
 {¶ 166} "THE COURT: Based on what the physician testified to Dr. El-Shammaa testified to, he did state that there was a team approach to this whole medical process that culminates with the physician looking at the child, starting with the nurse, to do an assessment — if it's an emergency situation, basically, or to what level of treatment needs to be done, if any, and that they use different people in the course of making — determining what medical treatment, if any, is needed, including the use of the social worker — services of the social worker.
 {¶ 167} "So, the Court overrules the objection.
 {¶ 168} "MS. SMITH: Okay. I'd just like to also note for the record that the nurse, the actual medical nurse that examined her, does ask essentially the same questions based upon my review of the nurse's records. So I would just like to state that for the record and continue my objection.
 {¶ 169} "THE COURT: So you're saying you wouldn't object if the nurse was here?
 {¶ 170} "MS. SMITH: Correct.
 {¶ 171} "THE COURT: Okay. Well, if this witness testifies that she has some specialized training and education, experience in this area, I'll allow her to testify.
 {¶ 172} "MS. SMITH: Thank you.
 {¶ 173} "(Thereupon, the side-bar discussion was concluded and the proceedings continued as follows:)
 {¶ 174} "Q. (By Ms. MacFadden) Let me back up a little bit. As part of the team, specifically,
 {¶ 175} what is your job?
 {¶ 176} "A. My job is to gather the information from the child and also from the parent, to do a forensic interview, if at all possible, with the child, pass that information on to the doctors and the nurses so they know how to treat the child.
 {¶ 177} "Q. Okay. And you have indicated that you have had special training in interviewing children?
 {¶ 178} "A. Yes.
 {¶ 179} "Q. Prior to interviewing the child, do you explain your — what you're about to do and why you're about to do this?
 {¶ 180} "A. To the child?
 {¶ 181} "Q. Yes.
 {¶ 182} "A. I tell them that we're going to be talking for awhile and then after that, a doctor is
 {¶ 183} going to take a look at them and make sure that they're okay.
 {¶ 184} "Q. And what is the setting that this occurs in?
 {¶ 185} "A. When children present to us, they usually come to the emergency room, so they are treated in an emergency room setting. We also have private rooms for interviewing.
 {¶ 186} "Q. So obviously, this is a hospital setting?
 {¶ 187} "A It's a hospital emergency room setting.
 {¶ 188} "Q. So everybody is running around with hospital garb on?
 {¶ 189} "A. Yes." Tr. at 203-208. (Emphasis added).
 {¶ 190} Upon review, the alleged child victim's statements to the social worker in the hospital setting was for the purpose of medical treatment and diagnosis; therefore, the trial court did not abuse its discretion in admitting the statements pursuant to Evid. R. 803(4). See also, State v. Graber, 2003-Ohio-137; State v. Dixon, 2004-Ohio-3940,State v. Moore, 2002-Ohio-4066.
 {¶ 191} Appellant's third assignment of error is overruled.
 IV {¶ 192} Appellant's fourth assignment of error alleges the trial court erred in permitting the testimony of Ohio State Highway Patrol Trooper Hodson in violation of Ohio Evidence Rule 403(A).
 {¶ 193} Evid. R. 403 states:
 {¶ 194} "(A) Exclusion mandatory
 {¶ 195} "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
 {¶ 196} Trooper Hodson testified at trial concerning statements appellant made during the course of a polygraph test. However, he did not mention the polygraph examination and there were no polygraph results admitted into evidence.
 {¶ 197} Appellant argues the trooper's testimony creates unfair prejudice to the appellant which substantially outweighs its probative value.
 {¶ 198} In State v. Souel (1978), 53 Ohio St.2d 123, the Ohio Supreme Court set forth the standard for the admission of polygraph test results. However, the Supreme Court has determined Souel is not applicable when the polygraph examiner testifies at trial without discussing polygraph results. State v. Spirko (1991), 59 Ohio St.3d 1.
 {¶ 199} Additionally, the Supreme Court has utilized a totality of the circumstances test for determining whether interviews conducted before polygraph examinations were voluntarily given. See, State v. Hughbanks
(2003), 99 Ohio St.3d 365.
 {¶ 200} In the present case, Trooper Hodson did not testify as to the test results, and he never indicated appellant was going to take a polygraph examination. Accordingly, the requirements of Souel are not applicable, and the trial court did not abuse its discretion in admitting the testimony.
 {¶ 201} Appellant's fourth assignment of error is overruled.
 V {¶ 202} Appellant maintains in his fifth assignment of error the trial court erred in failing to permit the proffered testimony of appellant's wife and sister regarding prior instances of sexual conduct involving the alleged child victim.
 {¶ 203} The trial court excluded the testimony pursuant to Ohio's Rape Shield Law, R.C. Section 2907.05, which renders inadmissible prior sexual conduct of a victim unless it involves "evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender," and only to "the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." See, State v.Graber 2003-Ohio-137, supra.
 {¶ 204} The trial court's determination whether to admit or exclude evidence pursuant to the Rape Shield statute rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. Id.
 {¶ 205} The following exchange took place regarding the testimony at trial:
 {¶ 206} "THE COURT: Okay. Assuming I'm not saying it does, but assuming that this that the rape shield law would not apply, how is other than attacking the credibility of Diamond Summerfield, how is that evidence going to be relevant to whether this Defendant touched Diamond Summerfield, had sexual contact with her, for the purpose of his or Diamond Summerfield's especially for his sexual gratification?
 {¶ 207} "MS. SMITH: It's relevant because there has been medical information submitted that is, albeit not conclusory, but is, I guess, consistent with what is being alleged. There are a number of areas in which her symptoms could have been derived, and certainly, physical contact in that area in another manner is very relevant.
 {¶ 208} "THE COURT: The medical evidence presented by the physician in this case showed there wasn't any medical —
 {¶ 209} "MS. SMITH: Nothing conclusory.
 {¶ 210} "THE COURT: Conclusory. In fact, other than what was determined to be, I believe, an infection or something —
 {¶ 211} "MS. SMITH: Which could be caused by a number of issues and could not be ruled out any allegations concerning Mr. Azbell could not be ruled out. Certainly, I think it's relevant that there's information presented as to other contacts she's had in that area physically.
 {¶ 212} "THE COURT: The Court denies the request of the Defendant to present that evidence, specifically on the basis of the rape shield law." Tr. at 340-341.
 {¶ 213} The trial court considered the testimony of Dr. El-Shamaa indicating the mere touching of the child's private area would not likely cause any physical injury and the most common cause for the child's condition was irritation. Dr. Shamaa further testified the physical findings were not conclusive of sexual abuse. Therefore, the trial court did not abuse its discretion in excluding the testimony of appellant's wife and sister regarding the six year old child's alleged sexual history pursuant to Ohio's Rape Shield law.
 {¶ 214} Appellant's fifth assignment of error is overruled.
 VI, VII {¶ 215} In his sixth and seventh assignments of error, appellant asserts the trial court erred in denying his motion for acquittal and/or new trial, and his conviction was against the manifest weight of the evidence.
 {¶ 216} In considering issues concerning the sufficiency of the evidence, our standard is as follows: "* * * [T]he inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
 {¶ 217} We are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978), 54 Ohio St.2d 279,376 N.E.2d 578.
 {¶ 218} In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court addressed the differing standards of review for a motion for acquittal and whether the verdict was against the weight of the evidence:
 {¶ 219} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
 {¶ 220} "With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson
(1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220,72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 221} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389,124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find thegreater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's,supra, at 1594."
 {¶ 222} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs,457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v.Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219,485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").
 {¶ 223} Appellant alleges the state failed to prove the element of "sexual contact" for the charge of gross sexual imposition, in violation of R.C. 2907.01(A)(4).
 {¶ 224} Section 2907.01(B) defines "sexual contact" as:
 {¶ 225} "`Sexual Contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, public region, or, if the person is female, a breast, for the purpose of sexually arousing or gratifying either person."
 {¶ 226} The alleged child victim testified at trial appellant "touched something he shouldn't have touched", and she referred to her "private spot." She further testified "it felt funny," and she is mad at him.
 {¶ 227} In addition, the licensed, independent social worker, Lynn Finnefrock, testified the child told her "her Danny did something bad to her," "he touched her crotch area", and the child actually demonstrated what appellant did by "putting her hands down her pants and moving it." Ms. Finnefrock further testified the child told her "it went inside" and "it hurt."
 {¶ 228} Trooper Hodson testified at trial appellant told him "he did inappropriately touch [the victim], who was five at that time, while she was staying with him on New Year's Eve. He said he felt sorry about it, he loved [her], and that it was an accident or mistake." Trooper Hodson also testified appellant admitted to touching the child's "crotch" for "15-20 seconds."
 {¶ 229} Detective Gary Pierce of Fairfield County Children's Services testified he interviewed appellant, and at one point appellant admitted his hand was on the child's "panties", and he knew it was "wrong" and "could not happen" because she was five and he was thirty-eight. Appellant told Detective Pierce he did not tell his wife about the incident the night it happened.
 {¶ 230} Upon review, the trial court did not err in overruling appellant's motion for acquittal and/or new trial. Viewing the evidence in the light most favorable to the state, there is sufficient evidence to conclude appellant had sexual contact with the child victim.
 {¶ 231} Furthermore, appellant's conviction is not against the manifest weight of the evidence. The jury was in the best position to weigh the evidence and to judge the credibility of the witnesses, and did not lose its way in finding appellant guilty.
 {¶ 232} Accordingly, appellant's sixth and seventh assignments of error are overruled.
 {¶ 233} Appellant's January 15, 2004 conviction in the Fairfield County Court of Common Pleas is affirmed.
Hoffman, J. Gwin, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment in the Fairfield County Court of Common Pleas is affirmed. Costs assessed to appellant.